# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## STARK ET ALS v. STARK ET ALS.

### June 15, 1922.

1. APPEAL AND ERROR—*Equity—Weight to which Decree Entitled where it is Founded on Oral Testimony—Case at Bar.*—In the instant case, a suit in equity between a father and mother, complainants, and their children, respondents, arising out of a verbal contract under which the farm of complainants and certain personal property was turned over to a son, the bill prayed for a construction of the verbal contract and that complainants' rights and interests in the real and personal property be established, and that the son be perpetually enjoined and restrained from claiming any right, title or interest in the property turned over to him. The son, on the other hand, claimed that under the contract he was to have the sole management of the farm, be the absolute owner of all the personalty, and that the contract was to continue during the lives of complainants, and upon the death of the survivor that the property was to go to the children of the complainants subject to a lien in favor of the son for any permanent improvements. These claims were denied by the complainants. The testimony of complainants fully sustained their view, and that of the defendants the view of the son. The case was heard in the trial court on the oral testimony of the witnesses, and the court found for complainants.

   *Held:* That the decree of the trial court should be sustained.

2. APPEAL AND ERROR—*Equity—Weight to which Decree Entitled where it is Founded on Oral Testimony.*—Where a case in equity is heard in the trial court on the o al testimony of witne ses, the finding of the court is entitled to great weight in the appellate court and will not be lightly set aside.

3. JUDGMENTS AND DECREES—*Opinion of Lower Court—Alleged Conflict between Opinion and Decree.*—In the instant case, the trial court delivered a written opinion in the case, and it was said in the petition for the appeal that the opinion showed that the trial court found in favor of the appellants, and then decreed in favor of the appellees.

   *Held:* That the decree of the court was simply its interpretation of its opinion, and a finding upon the facts in favor of the appellees, and is the authoritative and effectual opinion and judgment of the court.

4. SPECIFIC PERFORMANCE—*Statute of Frauds—Parol Contract Relating to Land—Specific Performance—Burden of Proof—Case at Bar.*—

In the instant case, complainants had title and possession of the property in controversy, and this title and possession respondents sought to supplant by proof of a parol contract fully performed by one of them. Respondents' answer was in the nature of a bill for the specific performance of this parol contract.

*Held:* That the burden of proving the parol contract alleged was on respondents, and that the evidence to establish it should be clear and convincing.

5. IMPROVEMENTS—*Right to Improvements—Parent and Child—Case at Bar.*—In the instant case, improvements were manifestly placed upon the land of his parents by a son under circumstances indicating that he was to have the benefit of them, and it seemed but fair and equitable, under the peculiar circumstances of the case, that the son should have credit for such permanent improvements as he put upon the land.

*Held:* That the decree of the trial court allowing the son credit for such improvements should be upheld.

Appeal from a decree of the Circuit Court of Culpeper county. Decree for complainants. Defendants appeal.

*Affirmed.*

The opinion states the case.

*Grimsley & Miller*, for the appellants.

*E. H. Gibson* and *Waite, Perry & Nottingham*, for the appellees.

BURKS, J., delivered the opinion of the court.

[1] This is one of those unfortunate family differences that sometimes find their way into the courts and which the courts find it so difficult to solve in accordance with legal and equitable principles and at the same time do justice between the parties. It is one of a series of four suits, all more or less connected with the same subject matter, and the evidence in two of which is reproduced in the record of this case. It is

a suit brought by a father and mother against their
four children, and, in order to get a clearer under-
standing of the situation, it will be necessary to make
a statement of the facts prior to and leading up to the
present litigation.

H. Mason Stark and his wife, Bettie C., were mar-
ried in November, 1870, and the next year he worked
on the farm of his father-in-law, in Hanover county,
where the first child was born in December, 1871.
His father had died a few years previous to that time
and there was assigned to him a tract of 132 acres of
land, and some years thereafter he acquired 110 acres
additional, making a total holding of 242 acres in 1901.
This 132 acres of which we are now to speak is located
in Culpeper county and is described as very poor, with
no improvements of any kind on it, "nothing but weeds,
huckleberry bushes and grapevines," or as put by
another witness, "nothing on God's earth on it except
pines, bushes, etc." Stark was then in his early twenties.
He was a strong, industrious, sober young man, with
a resolute will, and he determined to move upon this
unpromising piece of land, make a home for himself
and family, and extract from it a living. He left his
wife and child with her father the next year and went
upon the 132-acre tract, and cut and hauled the logs to
the sawmill, and had them sawed, and built upon it
a dwelling house twenty-four by sixteen feet, "the
best his means would afford," and also "put up some
temporary outbuildings out of logs, temporary hen-
house and a few other such things." To this home in
the wilderness Stark carried his wife, who was not less
resolute and courageous than her husband. Her father
aided them in procuring farming implements, and
moderate household equipment, and all of the personal
property then and thereafter stood in her name. With

this equipment, the young couple who had pledged themselves to take each other "for better or for worse" set to work to make a home and rear a family. We hear but little of their struggle during the intervening years, but after the lapse of thirty years from their marriage, we find that they have had seven children, three of whom had died, that the surviving children had all received such education as the schools of the neighborhood afforded, that the personal property on the farm had greatly increased in value, and that all of the children were still at home and together with the father and mother constituted a happy and united family. Such was the situation in 1901.

At this time the family consisted of Mr. and Mrs. Stark, and four children, Bruce, Lottie, Frank and Elba. Mr. Stark was somewhat crippled by rheumatism as a result of his hard life and exposure, was given to occasional outbursts of passion and intemperate language, and like many another pioneer had the gift of "cussing." The family, however, were accustomed to these frailties and did not permit them to mar their peace and happiness, but lived "harmoniously and contentedly together." At this time, Bruce, the oldest son, then about twenty-three years of age, seeing no future before him on the old farm, announced his intention of going West to better his condition. His mother describes the situation thus: "He said that he was not making anything there. He was very delicate, I had to nurse him like a baby, and of course, like a mother would, I was afraid if he would go away from me, or away from home, he would die, and just a mother's love, I was willing to give him almost anything to keep him there." His father and mother were anxious to have him remain at home, and offered him inducements to do so, and as a result

of these negotiations an oral agreement was entered into between the father and mother, on the one side, and Bruce Stark, on the other, and in pursuance of that agreement he remained on the farm. What were the terms of that agreement is the most controverted fact in this case. The father and mother insist that the agreement was that Bruce should have possession immediately of all the personal property, including the farming implements, and operate the farm. They speak of it as going into parternership in conducting the farm; that Mr. Stark was to work on the farm as he had always theretofore done; that Bruce was also to work on the farm; that he was to have charge of the financial affairs for the concern, and after furnishing a comfortable support for the family and the payment of all taxes and costs of supplies and other necessary expenses incident to the proper management and conduct of the farm, Bruce was to have any profits that arose from the conduct of the farm. They insist that no one was present when this verbal contract was entered into except the parties thereto; that no time was specified for its continuance and nothing was said about permanent improvements. Mrs. Stark testified that only the parties to the contract were present; that some of the children were at school and others too small to attend school. On the other hand, Bruce Stark insists that the contract was a family arrangement and that all the members of the family were present when it was entered into; that under the terms of the contract the personal property on the place should become immediately his; that he was to conduct the farm and furnish a support for his father and mother and such members of the family as remained there; that his father was to work on the farm whenever he felt like it, without pay, and that the

arrangement was to continue during the life of his father and mother and the survivor of them, and that upon the death of the survivor the property was to be divided among their children except that he was to have a preferred lien for any permanent improvements he might put on the place. We do not need to stop to consider this contract ahy further at present, but will advert to it later. It is mentioned now simply to show what the contention of the respective parties was with reference to this contract.

Whatever may have been the true contract between the parties, it is conceded in the application for an appeal that the parties "all lived up to the spirit of their contract; things moved smoothly, and they lived harmoniously and contentedly together up until the year 1914." The only disagreement between the parties on this question is that Mr. and Mrs. Stark say that the friction began in 1913. In the spring of the year 1914, Mr. Stark was in a highly nervous condition and became greatly excited and agitated over what he seemed to think was improper conduct on the part of Bruce Stark, and especially about laying off some corn rows. As a result of his excitement and consequent conduct, his son, Bruce, swore out a warrant of lunacy against him and the commission met and examined into his sanity. The justice of the peace on the commission was a brother of Mr. Stark, and one of the doctors was the family physician. Mr. Stark himself admitted that he was in a serious nervous condition and needed treatment. The commission found him to be insane and committed him to the Western State Hospital for treatment. He was accompanied to the hospital by his daughter, Elba, one of the defendants in this suit, who made frequent visits to him while there. He conceived a violent prejudice

against his son, Bruce, who had sworn out the warrant of lunacy, and on one of the visits of Elba he said to her that when he got out of the asylum he was going to sue Bruce. His son, Frank, also visited him while in the asylum, and he appealed to Frank to get him out of the asylum, but Frank refused to make any effort in that behalf on the ground that the doctors knew better what to do with him than he, Frank, did. After he had remained in the asylum for nearly two years, he made his escape and returned home, and Bruce promptly notified the asylum authorities that he was at home. This was in 1916. The superintendent of the asylum advised Bruce to let him remain as on furlough, but to watch him to prevent any violence on his part. He remained at home from 1916 to 1918 without any manifestation of violence on his part, or apprehension on the part of his wife. But the conduct of his son, Bruce, was a constant and increasing source of irritation to him. He felt that he had a right to manage the farm according to his notion, and that Bruce was interfering with that management, and in 1918 he applied to the Circuit Court of Culpeper for an injunction to restrain Bruce and his brother, Frank, from interfering with him in the management and conduct of the farm. At that time he had not been discharged from the asylum. The circuit court refused the injunction. Shortly thereafter he applied to the superintendent of the asylum for his discharge, which the superintendent declined to give. He thereupon instituted proceedings in the Circuit Court of Culpeper county to be discharged on the ground that he had been restored to sanity. When he made this application, Bruce, with his counsel, went to see the superintendent, and asked him about the mental condition of Mr. Stark, and the superintendent stated that

he was still insane, but that the State provided him no
funds for resisting applications of that character, and
that he intended to let the application go by default.
Bruce then stated to the superintendent that if that
was his opinion, he, Bruce, would employ counsel and
furnish the means to resist his discharge. This re-
sistence was put upon the ground of protecting Mr.
Stark against himself and his family against dangers
that might be apprehended from him. But in the
petition for this appeal it appears that "Bruce Stark,
his brothers and sisters, don't desire him to be dis-
charged just to engage in useless litigation with peti-
tioner or to squander the estate which Bruce Stark has
built up for him." After a full hearing of testimony
on the subject, Mr. Stark was discharged by the cir-
cuit court as restored to sanity.

The father of Mrs. H. M. Stark had died sometime
prior to 1901, and there was coming to her from her
father's estate about $2,500. This money, or a large
portion of it, had been paid over to the agent of Mrs.
Stark, Mr. A. J. Chewning, in the city of Richmond,
who had invested it for her benefit. Soon after the
contract of 1901 was entered into, she gave Bruce
$150. She also advanced to him $111 to pay a debt
which he was to pay for his father under the contract
of 1901. About that time Bruce wished to purchase
some land and begged of his mother the loan of $900,
which, after some chaffing between them, she finally
made, but took no evidence of the promise to repay
it. In 1905 she still had $1,100 invested by her cousin
in Richmond, and she says that Bruce insisted that it
was not well invested and besought his mother to let
him have this $1,100. She finally consented to let him
have it, she says to invest for her, and he says as a
loan. At all events, it is conceded that he got the

$1,100, and that no written evidence thereof was given. The interest on these two sums of money he paid from time to time as his mother wished it, until finally, in 1917, according to her testimony, she demanded the return of her principal, and she testifies that greatly to her surprise Bruce stated that he had already paid her the principal and owed her nothing. In January, 1916, Bruce conveyed all of his property, real and personal, to his wife, whom he had married in 1915. This deed was not put to record until August, 1917. After Bruce denied owing any part of the $2,000, suit was brought by Mrs. Stark against Bruce Stark and his wife, alleging the existence of the debt, and insisting that the money had gone into the land which he had conveyed to his wife, and if not, at least the deed to his wife was without consideration, and fraudulent in law, and that said deed should be set aside to pay the debt due to her. Bruce and his wife filed a joint answer to the bill in this case, in which they ignored the specific charges made in the bill, and simply denied that Bruce was indebted to Mrs. Stark in any sum, in any manner, at the time of the institution of the suit, or that the deed made to his wife was voluntary. They then specifically rely upon the statute of limitations as a bar to the claim. Counsel in that case, who were the same as the counsel in this, agreed that the entire record in that suit might be read in evidence in the present suit, and the entire record in the present suit might be read in evidence in that. There is copied into the record of this case the bill and answer in the suit of Mrs. Stark against Bruce and his wife, and the testimony of Mrs. Stark and of Bruce Stark, but no other part of the record or evidence is copied into this record.

What disposition was made of the case does not

appear from the record before us, but in the brief of
counsel for the appellees it is stated that the suit of
Mrs. Stark against Bruce and his wife went off on
the plea of the statute of limitations. The plea of
payment set up by the answer of Bruce and his wife
does not seem to be sustained by such of the evidence
as is before us. No receipts are filed, and.no evidence
outside of the testimony of Bruce and his brother and
sisters is given of such payments. His brother and
his sisters testify that they .had heard their mother
say that Bruce had repaid her, but they give no de-
tails. In his testimony he was asked when this money
was paid to his mother, and he replied "sometime
prior to 1910," and asked how he paid it, he replied,
"I don't know. I could tell you how I paid it but
my papers have been molested and tampered with,
and my records have been destroyed. I paid her one
sum of $1,100." No other evidence of the payment
of the $1,100 is presented by the record, except a stub
from a check book. The check is not produced, nor
evidence showing that any such check was ever drawn,
or ever received by her. When asked if he remembered
the amount of any check that he gave her on the
principal except the check for $1,100, he answered, "I
don't know that I could answer that correctly. I
don't remember positively. I paid her with check
or cash. I paid her at different times prior to that
time." But he could furnish no memorandum of any
such payments. Finally, as to the $900, he was asked
and answered as follows: "Q. Now, you have not
been able to find out how the $900 was paid out, I
believe?" "A. I stated that I paid part of it in cash
and possibly all in cash. I cannot say positively."
But no voucher of any kind was produced in evidence
of such payment. It would seem, therefore, that

that case went off, as stated by counsel for the appellees, on a plea of the statute of limitatinos.

The present suit was brought by H. Mason Stark and Bettie C., his wife, against their four children. The bill sets out most of the facts hereinbefore stated, except the result of the suit of Mrs. Bettie C. Stark against Bruce Stark and his wife, which was still pending, though the fact of the loan and its non-payment was set out. It sets out the oral contract of 1901 and speaks of it as a partnership agreement which was to be conducted in the name of H. M. Stark and Son. The complainants claim that the contract was that the personal property on the place, which belonged to Mrs. Stark, and the farm, should be turned over to Bruce Stark to be operated by him under the firm name of H. M. Stark and Son; that H. M. Stark was to work on the farm as he had previously done, and to direct the work of the farm, while Bruce Stark was to work on the farm and to have the direction of the outside affairs, including keeping the bank account, buying and selling of cattle, and the like, and out of the proceeds of the farm, under this contract, the family were to be supported and maintained, and after deducting such support and maintenance and all operating expenses, the profits arising from the operation of the farm were to be the property of Bruce Stark. Nothing was said as to any permanent improvements placed upon the property by Bruce Stark, nor as to the duration of the contract. The bill also sets out what Bruce Stark claimed to be the contract and the particulars in which he had failed to perform his obligations, if his view of the contract was sustained. The bill prayed that the true terms of the verbal contract between the complainants and Bruce Stark

should be ascertained and declared, and the complainants' rights and interest in the real estate and personal property be established; that the defendant be perpetually enjoined and restrained from claiming any right, interest or title in the real estate and personal property turned over to Bruce Stark, as aforesaid; or if the court should be of opinion that the appellants acquired an interest or right in the real and personal property aforesaid under the terms of the verbal contract between them and complainants, that the said contract might be annulled and set aside because of the breach and abandonment thereof by Bruce Stark, and his failure and neglect to fulfill the terms thereof; or that a partnership be declared in said real and personal property, and because of the impossibility of having the operations of said partnership continued that the same should be dissolved under the direction of the court, and for further relief.

The bill was answered by Bruce Stark and Frank Stark, in which they deny that the contract was as set up in said bill, and on the contrary allege that the contract was that the tract of 242 acres of land was to be turned over to Bruce Stark; that Bruce Stark was to manage and control the property as his own; that H. M. Stark was to assist him to the extent that he should labor on said farm without hire, but the management and control thereof rested solely in Bruce Stark; that the said Bruce Stark was to support the plaintiffs and such of their children as might desire to make their home with them in a manner becoming their means and station in life; that the personal property on said farm was to become at once the absolute property of the said Bruce Stark, and that all the revenues derived from the operation of the farm after deducting the expenses of operating the same, and the

support of the family, was to be the absolute property
of the said Bruce Stark as compensation for his under-
taking, and that this contract was to continue during
the lives of the complainants and the life of the sur-
vivor, and upon the death of the survivor the real
estate embraced in the contract was to go to the
children of the complainants, subject to a lien in
favor of Bruce Stark for any permanent improve-
ments he might put upon the land.

It will be observed from a comparison of the dif-
ferent views of the parties as to what the contract
was, that the chief differences were that Bruce Stark
claims that he was to have the sole management of
the farm, be the absolute owner of all the personal
property; that the contract was to continue during
the lives of the complainants and the life of the sur-
vivor of them, and upon the death of the survivor
that the property was to go to the children of the
complainants, subject to a lien in favor of Bruce
Stark for any permanent improvements he might
put upon the place.   These claims of Bruce. Stark
are denied by the complainants.   In addition to the
allegation above as to what the terms of the contract
were, the respondents give their version of the in-
sanity proceedings, deny that Bruce has in any way
failed to perform his part of the contract, admit that
the respondents have moved off of the place under an
agreement between counsel for both sides that such
removal was to be without prejudice to their rights,
and respondents offer to continue to perform the con-
tract on their part and set forth specifically the per-
sonal property which Bruce Stark says he is willing
to provide the complainants with; but they specifically
and particularly insist "upon those provisions of his
contract which provide that he shall have a lien on

said land for the value of the permanent improvements placed thereon by him, and at the death of the said H. M. Stark and Bettie C. Stark the said real estate is to be divided between their children, subject to the aforesaid lien." Respondents then pray that an injunction may be awarded them against the complainants, enjoining the complainants from disposing of said real estate or placing any lien thereon, and to that end, if necessary, that their answer may be read as a cross bill.

The testimony in the case was given *ore · tenus* before the trial court. On behalf of the complainants there were examined H. M. Stark and his wife, Bettie C. Stark, Dr. DeJarnette, and several neighbors as to the comparative condition of the farm in 1901 and now, and one or two other witnesses upon points not very helpful to the solution of the present differences. On behalf of the defendants, all four of the defendants testified and two other witnesses, whose testimony is not of sufficient importance to require special comment. There was also read into the record the testimony of H. M. Stark and Bettie C. Stark in the suit against Dr. DeJarnette to establish the sanity of H. M. Stark, and the bill and answer in the suit of *Bettie C. Stark* v. *Bruce Stark and wife,* hereinbefore referred to, and the depositions in that case of Bettie C. Stark and Bruce Stark.

It would be impossible in an opinion of reasonable length to give in detail the testimony of the different witnesses. It may be said in general that the witnesses on both sides are interested parties, and that the testimony of the complainants fully sustains their view, and that of the defendants, the view of Bruce Stark. The testimony of Dr. DeJarnette is valuable, not only from a professional standpoint, but also from a com-

mon sense view.    From a professional standpoint we learn what he means by insane as applied to Mr. Stark, as appears from the following question and answer: "Q. The idea that he has been persecuted is one of the symptoms of epilepsy, is it not?"   "A. No, sir, it may be but it is not necessarily so.   It is a paranoidal trend, you know, and in any form of insanity we very often find persecutory ideas; but epileptic insanity is usually impulsive, very irritable, and very variable; their conduct is very varied.   Sometimes they will be apparently normal for a long time, and then these outbursts of abnormal mentality will occur."   In other words, it is not a case of insanity with lucid intervals, but rather of sanity with outbursts of abnormal mentality.

Testifying unprofessionally, he gave some very wholesome advice.   He said:   "If there is such a thing possible as making up, they ought to make up, and I think it is a shame that they do not, and if they can make up it would be a God's send to the family to do it."   On the subject of his sons returning to live with him, Dr. DeJarnette said:   "I think the old gentleman is high strung and liable to become easily irritated and violent in his manner, and certainly in his talk, and I believe if his sons went back to him they would have the same trouble   *   *   *.   If the old man is sane and it is found out that he is sane, and by removing these boys he can get along better, it seems to me they ought not to be with him.   That is my notion.   Just common sense about the thing."   In answer to a further question on the same subject he says:   "If it was my father I would not hold him to it. I would let him go."

The following questions and answers show Dr. DeJarnette's estimate of the character of Mr. Stark:

"Q. He is not a man who would be imposed on, is he?" "A. Not if he thought that he was, not a minute." "Q. He is more likely to be aggressor then—" "A. (Interrupting) Well, I have always thought he was a man who wanted to do what was right. I believe that about Mr. Stark. I don't think he would willingly do what he thought was wrong." "Q. But an excitable, nervous man is usually an aggressor?" "A. Yes, he would be the aggressor when he thought his rights were imposed on." "Q. I have a little bit of that—" "A. Yes, he would lead the attack. He would not have anybody attack him." "Q. And he would not tolerate for a moment any affronts?" "A. I don't think he would." "Q. He would not tolerate it as much as an average man would?" "A. I don't think he would." "Q. And would be much more apt to take offense at trivial matters than the average man?" "A. Well, yes, but I got along with Mr. Stark very well. Splendidly most of the time, and I was keeping him in the hospital all the time."

We cannot say that the inconsistencies or improbabilities on either side are such as to turn the scale against it. Both sides have testified with apparent honesty of purpose, but the acts and declarations of each have been viewed from a different angle by the other. If the contract be as claimed by Bruce, it is certain that it cannot be carried out in its integrity. It is impossible according to admitted facts for him to live on the place and furnish the support contracted for. These old people find themselves in great distress in their present situation. They have lived on the place and worked hard for the last fifty years, and deny that they have made any contract whereby they have parted with the ownership of their home and personal property. H. M.

Stark expresses his view of the situation when, in answering a question as to what occasioned his excitement at the times mentioned, he said: "Well, to think my property had been taken away from me by a son even if I had entered into such a verbal agreement, and that with a poor old crazy father trying to take advantage of him! If that had been my father, as soon as I found out he was dissatisfied, I would have dissolved the partnership with him." Later on, when he was asked if he entertained any ill will towards his sons, he replied, "No," and then the mere suggestion of their relationship seemed to evoke from him a wail of anguish as touching as that of David over Absalom, and he exclaimed: "Would to God I had died before I ever came to this."

[2-4] The case, as we have stated, was heard in the trial court on the oral testimony of the witnesses. The court saw the demeanor of the witnesses on the stand and heard them testify. Moreover, it was the same court that had seen and heard the witnesses in the proceeding to have H. M. Stark adjudged to be sane. That court found against the appellants in the present suit. Certainly that finding is entitled to great weight in this court and will not lightly be set aside. *Barnard* v. *Barnard*, 132 Va. 155, 111 S. E. 227. The trial judge delivered a written opinion in the case, and it is said in the petition for the appeal that the opinion shows that the trial court found in favor of the appellants, and then decreed in favor of the appellees. The decree of the court was simply its interpretation of its opinion, and a finding upon the facts in favor of the appellees, and is the authoritative and effectual opinion and judgment of the court. The decree appealed from restores to Mrs. Stark the personal property substantially as it was delivered to

Bruce Stark in 1901. It denies to appellants any vested interest in the tract of land, delivers the same to H. M. Stark to be held by him in fee simple, and enjoins the appellants and Frank Stark (since deceased) from asserting "claims of any kind or nature to the right, title and interest of H. M. Stark in the said farm of 242 acres, more or less, except as to the claim for permanent improvements allowed Bruce Stark under this decree." There is abundant evidence in the record to sustain the decree except as to the permanent improvements. Although the appellees have not relied on the statute of frauds, they had title and possession of the property in controversy, and this title and possession the appellants seek to supplant by proof of a parol contract fully performed by Bruce Stark, which contract is set up in the answer of Bruce Stark and Frank Stark. In this answer respondents pray "that an injunction be awarded against the plaintiffs, enjoining them from disposing of said real estate or placing any lien thereon, and to that end, if necessary, this answer may be read as a cross bill." The answer is in the nature of a bill for the specific performance of the said parol contract. The burden of proving the parol contract alleged was on Bruce Stark and those claiming the benefit of said contract. Not only so, but it was necessary that such evidence should be clear and convincing. *Pierce* v. *Catron,* 23 Gratt. (64 Va.) 595; *Ford* v. *Euker,* 86 Va. 75, 9 S. E. 500; *Henley* v. *Cottrell,* 101 Va. 70, 43 S. E. 191; *Plunkett* v. *Bryant,* 101 Va. 814, 45 S. E. 742; *Cranes Nest Coal Co.* v. *Va. Iron, etc., Co.,* 108 Va. 862, 62 S. E. 954, 1119. The trial court, which saw and heard the witnesses testify, has held that the evidence does not measure up to that standard, and in that conclusion we concur. The material facts to

sustain the alleged contract are stated positively by the appellants in their testimony, and are equally as positively denied by the appellees in their testimony, and there is no other testimony on the subject in the record. It would be useless, therefore, to discuss the details of the testimony as to acts done or omitted in the performance of the contract, or the conduct of the parties towards each other.

[5] The decree of the trial court upholds the contention of the complainants, H. Mason Stark and wife, in all respects except as to the question of permanent improvements. The appellees deny that anything was said about permanent improvements, or any lien therefor. It is not disputed that some permanent improvements were placed upon the land, but it is not clear from the testimony in this case that Bruce Stark is entitled to credit therefor, yet it seems but just and equitable that they should be allowed to him if the appellees are allowed to recover the land. These improvements were manifestly placed upon the land by Bruce Stark under circumstances indicating that he was to have the benefit of them, and it seems but fair and equitable, under the peculiar circumstances of this case, that he should have credit for such permanent improvements as he put upon the land, and that the course directed by the trial court was the proper course to be pursued. Upon the whole case, in view of the finding of the trial court upon conflicting oral evidence heard by it, and of the failure of the appellants to sustain the burden of proof resting upon them, we are of opinion to affirm the decree of the Circuit Court of Culpeper county.

If, perchance, we have reached a wrong conclusion in this case, and the decree of this court unwittingly causes a pecuniary loss to Bruce Stark and his brother

and sisters, they must realize that their loss is the gain of a father and mother who have passed the allotted age of three score and ten, and that the loss so sustained is not to be compared to the debt which they owe to their parents who have given their best years to the rearing and maintenance of their children under very trying and difficult conditions.

*Affirmed.*

SIMS, J., dissenting:

I find myself unable to concur in the result of the majority opinion in this case. With much that is so well and forcibly said therein, and especially with the holding on the subject of the refusal of the granting of specific performance of the contract, I do concur. But it seems to me that the very same considerations upon which specific performacne of the contract is denied should lead to the denial of the rescission of the contract. The very same character of proof is required in order to obtain either relief; and there is the same kind of defect in the proof on the part of the appellees, seeking rescission, as there is on the part of the appellants, seeking specific performance of the contract, in the instant case. The denial of all such relief would leave the parties to their remedies at law.

Of the jurisdiction of equity to grant the remedy of cancellation or rescission of contracts, this is said, in 4 Pomeroy's Eq. Jur. (3d ed.), section 1377: "* * its exercise depends upon the adequacy of the legal remedies—a party being left to his affirmative *or defensive remedy* at law, where full and complete justice can thereby be done." (Italics supplied.)

There is absolutely no proof in the case of the existence of any of the primary grounds on which equity will cancel or rescind a contract, such as fraud,

accident, or mistake in the procurement of the contract. Nor is there any evidence whatever of any default on the part of the appellant, Bruce Stark, in the performance of the contract.    Under such circumstances a contract should not be cancelled or rescinded.

It is true that, in the instant case, the decree which is affirmed by the majority opinion, does not rescind the whole contract, but nearly so.    It leaves in force the provision of the contract touching the improvements made by Bruce Stark.    This operates to allow the latter damages to that extent because of the rescission of the contract.    It is not perceived why he is not equably entitled to any damages he may have sustained because of such rescission by reason of other outlay, in performance of the contract, of labor or money, for which he has not been fully compensated as provided for in the contract.

Aside from the question as to what the precise terms of the contract were, the whole case as made by the evidence, even from the standpoint of the plaintiffs in the court below, the appellees here, is that it would be a hardship upon them, and therefore inequitable, to enforce the specific performance of the contract.    This being so, all of the parties, should, as I think, be left to their remedies at law; since those remedies are adequate and complete, and, indeed, much more complete than in equity, under the circumstances of this case.    At law the appellees can refuse to further perform the contract on their part and proceed to deal with the property involved, real and personal, which is already in their possession, as they may choose, leaving the appellants to their remedy by action for damages for breach of the contract.    In such an action the terms of the contract can be ascertained by a jury from the evidence on

the subject, and whatever damages the appellants may have sustained, if any (and the same is true of the appellees), can be assessed by a jury (the preferable method of ascertaining all damages), and recovered. That course will more adequately satisfy justice and be less likely to do injustice to any of the parties, than to arbitrarily cancel the contract.

As said in *Wright* v. *Pucket*, 22 Gratt. (63 Va.) 370: "Whenever damages will answer the purposes of indemnity, this alternative will be preferred * *."

The ends of justice would be best attained, as I think, if the suit were dismissed, without prejudice to the rights of any of the parties at law.