# Richmond

VIRGINIAN RAILWAY COMPANY v. W. J. HILLSMAN.

March 22, 1934.

Present, All the Justices.

The opinion states the case.

*Hall, Buford & Leftwich,* for the plaintiff in error.

*Watkins & Brock* and *J. K. Early,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

The petitioner, Virginian Railway Company, is here complaining of a verdict and judgment in favor of W. J. Hillsman in an action for damages arising from personal injury.

The facts deemed necessary to be stated are that on the morning of February 22, 1931, just after midnight, Mr. Hillsman drove from his home in Farmville, Virginia, to the railroad company's station at Abilene, Virginia, for the purpose of meeting his daughter, who was a passenger on the company's train, scheduled to arrive at that station about that time. The night was dark and it was raining. Mr. Hillsman had been at the station only twice before the night in question; once in the preceding September, in the daytime, and again more than a year before the night of the accident. After arriving at the station and in advance of the arrival of the train he parked his car at the rear side of the station building and awaited the incoming of the train. He and his daughter shortly thereafter started on the return trip to Farmville. Leading out from the station and over the company's premises is a roadway which crosses a ·ditch variously estimated from four to ten feet deep and quite wide, the evidence not being clear as to the exact width. This ditch was designed by the company for drainage purposes and it remained open. It was located about forty feet to the north of the station and was crossed by a culvert or bridge which constituted a part of the roadway to be traveled by Mr. Hillsman in reaching the public road leading to Farmville. This way over the culvert was from ten to sixteen feet wide, varying with the testimony. Just before reaching the culvert it is approached by a sharp curve which includes the bridge or culvert. It is built up from the bottom of the ditch by timbers with a filling of some sort between them over large drainage pipes. The evidence is in conflict as to whether the sides of this bridge or culvert were perpendicular or slanting from the bottom to the top. As Mr. Hillsman was making the turn and going on the bridge, the lights of his car being directed by the course to his right, and being guided by his lights with·his vision fixed that way, his car slipped on the left side and went down into the ditch. He testified that at first the descent was gradual and then it went

down suddenly, turning over on its side and throwing his daughter against him.

There were no lights at or near the bridge or culvert crossing and there were no guard rails or similar means of preventing the traveler, failing to negotiate the bridge way with necessary particularity, from falling into the ditch.

The plaintiff alleged injuries to his left leg growing out of the accident which permanently disabled him and the gravamen of his complaint is that the defendant was negligent in failing to maintain reasonably safe premises and conditions for the protection of those lawfully upon its property and lawfully using the same; that the ditch and bridge, under the conditions obtaining, unguarded and unlighted, constituted negligence for which defendant is properly and legally answerable in damages for the injuries he sustained.

The defendant contends that the driveway over the ditch was of sufficient width to accomodate traffic going to and from its station and that the roadway was plainly marked by travel which had worn down the cinders which covered it so that there was no hazard connected with its use and it relies upon the contributory negligence of the plaintiff in driving his car into an open ditch eight feet deep and from eight to ten feet wide without turning on his lights or without looking in the direction in which the car was being driven. It also contends that the plaintiff was not injured in the manner and to the extent alleged in his complaint.

The jury rendered its verdict for the plaintiff, assessing the damages at $1,200.00, which was sustained by the trial court. As to every important defense urged the testimony was conflicting. There was no evidence that the lights of the plaintiff's car were not turned on and effective. The plaintiff and his daughter both testified that their lights were on at the time of the accident. The plaintiff testified that he was looking ahead and that his lights shone to the right, which was in line with the direction of the

going car making the curve movement. The lights of necessity illuminated the right side rather than the left.

 The evidence is undisputed that the plaintiff approached the bridge very slowly and cautiously; that he had not gone far enough to attain speed of any moment, indeed his car was still in low gear; that in making the turn he felt his car slipping at the left side and it went down, turning over in the descent. This, of course, bears upon the question of contributory negligence, which is for the determination of the jury when there is a conflict of evidence. Here there is abundant warrant for the conclusion that the plaintiff was operating his car not only without negligence but in the exercise of pronounced caution and care. Certainly there is no room for this court to say that he was guilty of contributory negligence as a matter of law.

Coming now to the question of the alleged negligence of the defendant in allowing to exist a physical condition of its premises which created a situation which was dangerous and hazardous we quote a part of the testimony.

The plaintiff's witness, Chappell, testified:

"Q. Although you never made any complaint to the railroad company, you did always consider it a dangerous place?

"A. Yes, sir, even today I consider that a dangerous place, and all my life I was very particular in traveling around there with my team and automobile, and people would have to take notice of a place of that sort, and I considered it in my estimation a very dangerous place, and it was a close drive to get around there with a team or car, but as to the foot or inches I never had occasion to measure it, or how wide the road was, it is just estimates that I am giving you, I haven't measured it, but I consider it a dangerous place.

"Q. You have referred to some switch ties that were laid along side this crossing. Did they have the effect of acting as a barrier or obstruction to keep a car from running over?

"A. No, sir, they were simply thrown in there, and as these gravels worked down, they were put there to hold those cinders from going down and making the road narrower. As the banks began to slip away they throwed some old ties to keep the cinders back, but I have never seen anything there to hold a car, they simply seemed to be thrown against that bank to hold the cinders, and when you go on cinders they keep crawling like that (indicating) was just my idea about it, but I have never seen anything there that was put there to keep a car or anything from going over.

"Q. Did I understand you to say in crossing this bridge the back wheels of your car or wagon you felt these switch ties give?

"A. You could feel them give in that bank and the hollowness under those cinders, that has been my experience with them."

And on cross-examination:

"Q. Mr. Chappell, do you consider your county roads, where there is a sixteen foot pipe under the culverts, dangerous?

"A. It depends upon the location of the culvert as to whether I would consider it dangerous, or not. If it were just a shallow ditch simply over a drain, I think it was all that was necessary, but if you are going to put a fill six or seven feet deep, I would consider it dangerous. That is my opinion, I don't know whether I am right in giving my opinion.

"Q. That is what I asked you.

\* \* \* \* \* \* \* \*

"Q. You have seen places just as dangerous as this place you are talking about at Abilene station?

"A. Not according to the location, we haven't a curve in Prince Edward county that I know of with such an angle as that. It depends on the location of the approach to the fill or pipes. You see in that special place we had to make a special bend to get on that, and it made it much more dangerous. You could stand a lot more if the

road was straight. That is my idea, if I am allowed to speak from that point."

■ The testimony of the defendant stoutly controverts that of the plaintiff as to its negligence in the last mentioned particular, but we are bound by the verdict of the jury when there is sufficient evidence to sustain it. We cannot say that the conclusion of the jury was plainly contrary to the evidence or without evidence to support it. The plaintiff is also before us with the added advantage of the judgment of the trial court in his favor.

■ This court has repeatedly said that where the judge of a lower court hears the evidence, he is in a better position than the appellate court to pass upon the facts, and his decision must be accorded very great weight. See *Stark* v. *Stark,* 133 Va. 310, 112 S. E. 680; *Boorde* v. *Com.,* 134 Va. 625, 114 S. E. 731; *Bernstein* v. *Bord,* 146 Va. 670, 132 S. E. 698; *U. S. Fidelity, etc., Co.* v. *Country Club,* 129 Va. 306, 105 S. E. 686.

■ As to the manner of the infliction of the injury and its extent we have the testimony of the plaintiff, which is uncontradicted, that his daughter was thrown against his left leg by the sudden movement of the car to the bottom of the ditch, and it was then he felt a little sprain in his knee which he did not, at the time, think was serious. His daughter testified that when they reached home from the scene of the accident her father complained of pain in his leg.

Mr. Kizer, the station agent, and a witness for the defendant, stated that the plaintiff, a week or ten days after the accident, told him he was having trouble with his knee and that he was lame or limping at the time. The plaintiff's own testimony was to the effect that the injury grew in intensity to the condition of his inability to do his work as he had done it before; that he could not walk and go up and down steps as he had been accustomed to do; that his leg would not bear his weight and that his knee was in continuous pain.

The defendant sought to meet this by emphasizing the

fact that the plaintiff, although requested by it, through its claim agent, by two letters addressed to him asking if he or his daughter had sustained any injury in the accident, failed to report his injury until April 4, 1931, a month and eleven days after the accident. It urged the reasonable effect of the plaintiff reporting the accident promptly and claiming damages for injuries to his automobile, which were paid, and remaining silent for so long a time on the subject of his own injuries. The plaintiff's explanation of this was that he at first did not think his injury was serious and thought that it would pass away, but it proved to be progressive. Of course, the plaintiff's delay in reporting his injury furnished material for forceful argument but it was not convincing with the jury or the court.

There was evidence that until the accident the plaintiff was a healthful, active and strong man. At the instance of the defendant the plaintiff was examined by a number of experienced and reputable physicians, some of whom were expert diagnosticians and surgeons. There was evidence that the plaintiff had arthritis at the time of the accident and that this disease existed in an inactive state for some time before and that his injuries were attributable to that. This was strengthened by the result of x-ray films or pictures showing callous formations on the bones of the knee. But here again the evidence is sharply conflicting. The defendant's expert witnesses were not in accord as to the genesis of the plaintiff's condition. One of them, who testified at much length, stated that he found the plaintiff's trouble to be miocarditis, or heart failure, and that he had never been able to tell whether the accident had anything to do with the plaintiff's condition.

The testimony of other medical witnesses tended to prove that the plaintiff's condition, consisting of the enlargement of the knee and its baneful effects, was due to the accident; that it could be ascribed to trauma as well as arthritis, and that if arthritis were already present a trauma or injury would, in all likelihood, aggravate it.

The evidence further tended to prove that the plaintiff's condition was permanent.

As has been before suggested, the case, on all the issues presented, seems a typical one for the jury.

In the case of *Forbes & Co.* v. *So. Cotton Oil Co.,* 130 Va. 245, 108 S. E. 15, 19, this court said: "If there is conflict of testimony on a material point, or if reasonably fairminded men may differ as to the conclusions of fact to be drawn from the evidence, or if the conclusion is dependent upon the weight to be given the testimony, in all such cases the verdict of the jury is final and conclusive and cannot be disturbed either by the trial court or by this court, or if improperly set aside by the trial court, it will be reinstated by this court."

See, also, *Atlantic Coast Line R. Co.* v. *Wheeler,* 147 Va. 1, 132 S. E. 517, 136 S. E. 570.

The comparatively recent case of *Hamrick* v. *Fahrney,* 157 Va. 396, 161 S. E. 43, 45, is in some particulars very like the case in judgment. It was there said through the late Chief Justice Prentis: "The plaintiff bases his claim to recover upon the injuries which he attributed to the collision—that is, three broken ribs and curvature of the spine. The testimony as to the original cause of the curvature of the spine leaves grave doubt upon the impartial mind. Whether this had existed long previous to the accident, or was caused by the accident, is quite uncertain, but there seems little doubt that, even if of long standing, it was aggravated. The accused was twice examined by experts. Dr. Voshell, about four months after the plaintiff's injury, stated that it was not possible to determine whether the scoliosis or the strain arose from the accident. He was examined later by Dr. R. P. Bell, a witness for the defendants, in July or August, 1930, and he says that he then had curvature of the spine—that is, the spine was curved laterally, termed scoliosis, which means a lateral curvature of the spine. He expressed the opinion that it had existed for several years, but that he could not say this with certainty; that scoliosis cases are generally

slow in developing; that it was unusual for it to come from an accident, the most common cause in his opinion being infantile paralysis. He also expresses the opinion that it would be impossible for him or the most skilled surgeon to tell the cause of the condition in which he found the plaintiff, and that it was possible for it to have come from the injury which he received, and that if, as he claimed and as some of the witnesses testified, he was in perfect health up to the time of the injury, his condition tended to indicate that his injury was the cause of that condition. This being the testimony, it cannot be said, as a matter of law, that the plaintiff's condition was neither caused nor aggravated by his injury. Therefore there was nothing else for the court to do in that state of the testimony except to submit it to the jury by an instruction similar to instruction No. 11. We find no error in that instruction."

If a fall aggravates a latent case of tuberculosis in the knee and thereby starts up a process of diseases that develops a stiff knee, the defendant is answerable for such development if the fall is due to his fault. *Herndon v. City of Springfield*, 137 Mo. App. 513, 119 S. W. 467.

The defendant invokes the doctrine or principle that where damages are claimed for injuries, which may have resulted from one of two causes, for one of which the defendant is not responsible, the plaintiff's action must fail. It cites a number of cases decided by this court in support of this defense. One is *C. & O. R. Co.* v. *Whitlow*, 104 Va. 90, 51 S. E. 182. In that case there were several stagnant pools from which the malarial fever germs, carried by mosquitos, might have emanated. Some of the pools were on the defendant's right of way, and some were on the plaintiff's premises. It was just as probable that they came from the one source as the other. That is not this case. The differentiation is patent.

Another is *Honaker* v. *Whitley*, 124 Va. 194, 97 S. E. 808, in which there were two operations by two dentists and the question was, which operation caused the broken

or fractured jaw bone of the plaintiff, who sued the author of the first operation. The principle here enunciated was applicable. The statement made shows the dissimilarity between that case and the case being considered.

Another case relied upon is *Gen. Accident, etc., Corp.* v. *Murray,* 120 Va. 115, 90 S. E. 620. There was a demurrer to the evidence by the defendant. The plaintiff's intestate had not fully recovered from a case of smallpox. He developed erysipelas from which he died. It was claimed that the deceased, when convalescent, had worn a pair of new shoes from which an abrasion on his ankle resulted and the infection from this caused erysipelas. It was urged that this was an accident which brought the action within the terms of an accident clause in an insurance policy. The court said there was no evidence to support the theory of the plaintiff. On the contrary, it was shown that erysipelas frequently followed smallpox by a germ which entered the postules or sores occasioned by the disease. The decision of this court turned upon the evidence. The case, we think, is not important here for the purpose for which it is cited.

■ The defendant challenged the ruling of the trial court in excluding from the evidence a photograph of its premises offered to show the situation around its station. The picture was taken in the summer following the accident. The ditch had been filled in. There had been some change in the driveway. The court held that there was no satisfactory evidence that the conditions were the same at the time the picture was taken as they were when the accident occurred. We think that there was no error in this ruling of the court.

The refusal of the court to grant instructions Nos. 6 and 9, tendered by the defendant, was made the basis of alleged error. These instructions are as follows:

"Instruction No. 6. The court instructs the jury that, if they believe from the evidence that there was on defendant's premises, for the use of its patrons, a well-defined driveway, covered with cinders or slag, and that

such driveway could be clearly seen and was obvious to anyone using said premises in the exercise of ordinary care, and that the plaintiff, through failure to turn on the lights of his automobile, or because his vision through the windshield of his automobile was obstructed, or through any other cause for which the defendant was not responsible, failed to see said driveway, and drove his automobile off the driveway into the ditch or drain, then the plaintiff was guilty of such contributory negligence as will bar a recovery in this case, and the jury must find for the defendant."

"Instruction No. 9. The court instructs the jury that the defendant was not required to use a higher degree of care in the construction of the driveway over the ditch on its premises at Abeline than is customarily used in the construction of county and other roads in the locality in which Abeline is located, and if the jury shall believe from the evidence that the roadway over the drain pipe in the ditch on defendant's premises at Abeline was of sufficient width and was constructed and maintained by the defendant in view of this particular situation in as safe condition for travel thereon as for travel over similar drain pipes constructed and maintained in county and other roads in that locality, then the defendant was not guilty of negligence by reason of the manner in which it constructed and maintained its driveway over the ditch on its premises at Abeline."

█ Instruction No. 6 was rightly refused because there was no evidence upon which to base the contention that the plaintiff failed to turn on the lights of his automobile or that his vision through the windshield was obscured.

█ Instruction No. 9 was properly refused. If the standard of care required of the defendant is the same as that to be exercised by county road authorities, which proposition we do not concede, the evidence in this case does not justify the instruction. It was not shown that any situation similar to that in question existed in the county's road system.

The case of *N. & W. Ry. Co.* v. *James,* 147 Va. 178, 136 S. E. 660, 663, quotes with approval the following: "In *Strange* v. *Bodcaw Lumber Co.,* 79 Ark. 490, 96 S. W. 152, 116 Am. St. Rep. 92, the court said: 'The law is now well settled that it is unlawful to make an excavation, or to put a dangerous obstruction of any kind adjoining the public highway, and leave it in a condition to endanger the safety of those who are traveling thereon, and who, themselves, are in the exercise of ordinary care. When one makes an excavation of that kind on his own ground adjoining the public highway, he should exercise due care to protect the public against the danger of accidents caused by such excavation, and, if necessary, should erect a fence or guard rail for that purpose.'

"In *B. & O. Ry. Co.* v. *Boteler,* 38 Md. 568, note in 14 A. L. R. 1403, plaintiff missed the entrance of the bridge built by the railroad company, while attempting to cross the bridge on a dark night. The court held that 'the railway company was bound to protect the edges of the embankment, so as not to render the approaches unsafe to persons who might miss the way at night.' "

In the case of *N. & W. Ry. Co.* v. *Spears,* 110 Va. 110, 65 S. E. 482, the syllabus is: "A verdict of the jury awarding damages for a nervous disorder resulting from personal injury will not be set aside as contrary to the evidence when there is sufficient evidence for the jury to have concluded that the nervous disorder complained of was more probably due to the injuries received than to any other cause."

In *Winfree* v. *Jones,* 104 Va. 39, 46, 51 S. E. 153, 155, 1 L. R. A. (N. S.) 201, it is said: "It is often difficult to determine what damages should be considered as flowing, in a natural and continuous sequence, from an act of negligence, and where there is doubt it is a question for the jury."

For the reasons stated, we affirm the judgment of the trial court.

*Affirmed.*