# CASES DECIDED

## IN THE

# Supreme Court of Appeals

## OF VIRGINIA

### Richmond.

ATLANTIC COAST LINE RAILROAD COMPANY v. J. L. WHEELER.

March 18, 1926.

Reheard January 20, 1927.

1. APPEAL AND ERROR—*Setting Aside Judgment and Verdict—Case Considered as on a Demurrer to the Evidence—Section 6363 of the Code of 1919.*—Under the Code of 1919, section 6363, the verdict of the jury and judgment of the trial court cannot be set aside unless it appears from the evidence that they are plainly wrong or without evidence to support the verdict. In determining this question, where it "involves the credibility of witnesses whose testimony the jury might reasonably have believed, or the weight to be given to their testimony, or a question of a mere preponderance of the evidence," the case must be considered as on a demurrer to the evidence by the plaintiff in error.

2. NEGLIGENCE—*Natural and Probable Consequences—Ability to Foresee Particular Injury.*—When defendant's primary negligence has been established, plaintiff's right to recover does not depend upon defendant's ability to foresee or anticipate that the particular injury might result from such negligence. Under such circumstances, the defendant is liable for the natural or probable consequences of its own act. In other words, if the act or omission is one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others, then he is liable for an injury proximately resulting therefrom, although he might not have foreseen the particular injury which did happen.

3. MASTER AND SERVANT—*Inexperienced Servant—Warning.*—It is the duty of the master to inform an inexperienced servant of danger ordinarily incident to the service, and if he fails to do so and the servant had

no opportunity to learn, then the servant will not be held to assume risks not obvious to one of his age, experience or judgment.

4.  Master and Servant—*Inexperienced Servant—Warning—Questions of Law and Fact.*—The question whether the servant should have been warned is always for the jury upon the evidence.

5.  Negligence—*Proximate and Remote Cause—What Constitutes Proximate Cause.*—To constitute proximate cause, creating liability for negligence, the injury must have been the natural and probable consequence of the negligent act. If the consequences follow in unbroken sequence from the wrong to the injury, without any intervening efficient cause, it is sufficient, if at the time of the negligence the wrongdoer might, by the exercise of ordinary care, have foreseen that some injury might result from his negligence.

6.  Appeal and Error—*Negligence—Negligence for the Jury—Case at Bar.*— In the instant case, an action by a servant against his master for injury to his eyes, alleged to be due to lead poisoning, caused by the negligence of the master while he was employed as a painter, the jury found for the plaintiff. There was ample evidence introduced tending to prove a different state of facts which if believed by the jury would have justified a different conclusion upon the question of the defendant's primary negligence. But this was a question for the jury, and their finding against the defendant is conclusive on appeal.

7.  Master and Servant—*Negligence of Master—Lead Poisoning—Proximate Cause—Case at Bar.*—In the instant case, an action by a servant against his master for injury to his eyes alleged to have been caused by the negligence of the master while the servant was employed as a painter, the jury found for the plaintiff. The defendant, knowing that the use of a paint blow gun when a strong wind was blowing would probably cause injury to the operators, purchased face masks for their protection, but negligently failed to warn or instruct the plaintiff of such danger, which failure caused the plaintiff to contract lead poisoning. Plaintiff was a carpenter and only temporarily employed as a painter. Loss of eyesight was the natural consequence of having his optic nerve atrophied by the action of the lead poison.

    *Held:* That the negligence of defendant being the cause of the lead poisoning, which caused the injury, was the *causa causans*, or proximate cause, of the injury; and the fact that lead poisoning does not always injure one's eyesight was of no moment, since the evidence was that it did produce atrophy of the nerves and loss of vision in the instant case.

8.  Master and Servant—*Proximate Cause—Question for the Jury—Case at Bar.*—In the instant case, an action by a servant against his master for injury to his eyes through lead poisoning, it was contended that defendant's negligence was not the proximate cause for plaintiff's blindness. One of the experts testified that optic neuritis frequently follows lead poisoning.

Syllabus.

*Held:* That the question of proximate cause was for the jury, and they having found that the alleged wrongful act was the proximate cause of plaintiff's loss of sight, it could not be said that their finding was without evidence to support it.

9. Master and Servant—*Contributory Negligence—Question for Jury—Injury to Eyes from Lead Poisoning—Case at Bar.*—In the instant case, an action by a servant against his master for injury to his eyes from lead poisoning, the contributory negligence of plaintiff was for the jury.

10. Negligence—*Proximate Cause—Questions of Fact.*—The question of what is the proximate cause of an injury is ordinarily a question for the jury.

11. Instructions—*Repetition—Party's Theory Fully Covered.*—Where the instructions given were exceedingly favorable to the defendant, and fully covering its theory of the case, it was not reversible error for the court to refuse other instructions asked for by the defendant.

### On Rehearing.

12. Appeal and Error—*Case Considered as on a Demurrer to the Evidence—Case at Bar.*—The instant case was an action by a servant against his master for damages for plaintiff's blindness. Plaintiff alleged that the proximate cause of his blindness was lead poisoning resulting from the negligence of the defendant whereas defendant asserted that the blindness was not the result of lead poisoning but of glaucoma, a disease of the eye, which is not the result of poisonous influence. There was evidence in support of both the theory of the plaintiff and the theory of the defendant, and the evidence was evenly balanced between the parties. The jury found for plaintiff and defendant appealed.

*Held:* That defendant's case not being of the exceptional character where a strict and technical enforcement of the rule that cases arising under section 6363 of the Code of 1919, are still to be heard in the Supreme Court of Appeals practically as on a demurrer to the evidence by the plaintiff in error, would work injustice, the appellant in the instant case stood practically as a demurrant to the evidence.

13. Demurrer to the Evidence—*Statement of the General Rule.*—A demurrant to the evidence is considered as admitting the truth of all his adversary's evidence unless inherently incredible, or judicially known to be untrue, and all just inferences that can properly be drawn therefrom by a jury, and as waiving all of his own evidence which conflicts with that of his adversary, or which has been impeached, and all inferences from his own evidence, although not in conflict with his adversary, which do not necessarily result therefrom; and *if several inferences may be drawn from the evidence differing in*

degree of probability, those most favorable to the demurree must be adopted unless forced, strained or manifestly repugnant to reason.

14. APPEAL AND ERROR—*Case Heard as upon a Demurrer to the Evidence— Question for Plaintiff in Error to Consider.*—Where the jury has found for the plaintiff upon conflicting evidence the question which defendant has to consider is as follows: If after the plaintiff had introduced all of his evidence, and the defendant had been permitted to show consistent but omitted facts, the case had been submitted to the jury and they had found the verdict for plaintiff, could the trial court have set it aside under section 6251 of the Code of 1919, or could the appellate court, under section 6363, set aside a judgment of the trial court in accordance with the verdict, because plainly contrary to the evidence, or without evidence to support it?

15. APPEAL AND ERROR—*Conflicting Evidence—Weight of Evidence for Jury.*— If there is conflict of testimony on a material point, or if reasonably fair-minded men may differ as to the conclusion of facts to be drawn from the evidence, or if the conclusion is dependent upon the weight to be given to the testimony, in all such cases the verdict of the jury is final and conclusive and cannot be disturbed either by the trial court or by the appellate court.

16. APPEAL AND ERROR—*Case Considered as on a Demurrer to the Evidence.*— Under the rule governing a demurrer to the evidence on an appeal by a defendant from a judgment in favor of plaintiff, very little if any of the testimony for the defendant can be considered.

17. MASTER AND SERVANT—*Negligence—Proximate Cause—Loss of Sight from Lead Poisoning—Case at Bar.*—In the instant case, an action by a servant against his master for the loss of his sight through lead poisoning due to the negligence of the master, plaintiff's expert testified plaintiff was suffering with optic neuritis which might have been caused by lead poisoning. He also testified that lead poisoning may result from paint. Another expert for the plaintiff testified that plaintiff was suffering from glaucoma when he examined him, but that it did not follow that his trouble was not caused by lead poisoning.

*Held:* That upon the testimony and inferences which the jury might fairly have drawn therefrom the Supreme Court of Appeals was unable to say that a verdict for the plaintiff was plainly contrary to the evidence or without evidence to support it.

18. MASTER AND SERVANT—*Negligence of Master—Whether Negligence of Master Proximate Cause of Injury—Case at Bar.*—The instant case was an action by a servant against his master for loss of sight from lead poisoning caused by the alleged negligence of the master. The plaintiff asserted that the loss of his sight was due to lead poisoning, whereas defendant asserted that the plaintiff was suffering from glaucoma which was not the result of the lead poisoning. The jury, from the evidence, might have found that plaintiff's blindness was

proximately caused by paint poisoning and that the glaucoma was a supervenient result.

*Held:* That the question was one for the jury and that their finding for plaintiff was conclusive.

19. Appeal and Error—*Point not Raised Below—Qualifications of an Expert.*—On appeal by defendant the damaging effect of the testimony of an expert for plaintiff was sought to be overcome by a vigorous assault on his competency to testify as an expert on diseases of the eye. But no such objection was raised in the trial court.

*Held:* That the objection could not be raised for the first time on appeal.

20. Expert and Opinion Evidence—*Qualification of Expert—Optometrist—Case at Bar.*—In the instant case defendant contested the competency of an expert witness for plaintiff on diseases of the eye. This witness testified that he was an optometrist, and that "optometry is the practice on the eye exclusively and to do everything practically except surgery and treatment," and that he "diagnosed cases," and when he thought it necessary he referred patients to a medical practitioner. Furthermore, his testimony on the subject of the treatment of diseases of the eye displayed such knowledge of the subject as satisfied the appellate court that he was competent to testify as he did.

Error to a judgment of the Circuit Court of Chesterfield county, in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Wm. B. McIlwaine, Robt. W. Strange* and *Mann & Townsend,* for the plaintiff in error.

*Wm. Earl White* and *Chas. T. Lassiter,* for the defendant in error.

West, J., delivered the opinion of the court.

J. L. Wheeler brought action against the Atlantic Coast Line Railroad Company for injury to his eyes, alleged to be due to lead poisoning caused by the neg-

ligence of the company, while in its employ as a painter. The jury returned a verdict of $10,000 for the plaintiff, upon which the court entered the judgment now under review.

The parties will be referred to as plaintiff and defendant, with reference to their positions in the trial court.

The principal assignment of error is the action of the court in refusing to set aside the verdict of the jury, because contrary to the evidence and without evidence to support it, and enter a final judgment for the defendant.

The declaration alleges that the defendant was negligent in failing—To warn and instruct the plaintiff how to use and apply the paint safely; to furnish him with a safe and suitable place to work; to furnish him with safe and suitable appliances with which to work, and to inspect the appliances, place of work and conditions under which the work was being done.

The defendant contends that it has been guilty of no negligence, and that the condition of plaintiff's eyes was not caused by lead poisoning.

[1] Under the Code, section 6363, the verdict of the jury and judgment of the trial court cannot be set aside unless it appears from the evidence that they are plainly wrong or without evidence to support the verdict.    In determining this question, where it "involves the credibility of witnesses whose testimony the jury might reasonably have believed, or the weight to be given to their testimony, or a question of a mere preponderance of the evidence," the case must be considered as on a demurrer to the evidence by the plaintiff in error. *N. & W. Ry. Co.* v. *Thayer,* 137 Va. 294, 119 S. E. 107.

Considered as upon a demurrer to the evidence, the jury could well believe that the evidence proved the following facts, tending to establish the primary negligence of the defendant:

In July, 1922, J. L. Wheeler, the plaintiff, was employed by the defendant in its Pocahontas yards, at Petersburg, Virginia, as a carpenter. He was then in splendid health and his eyesight was unimpaired. The regular painters at the Clopton yards, near Richmond, were on a strike, and on August 11, 1922, Wheeler was transferred to the Clopton yards, and, against his wishes, put to work as a painter. He informed his boss that he was not a painter, knew nothing about paints, and that he could neither read nor write. He was first ordered to paint cars with a brush. Later, Wheeler and Martin, who were the only painters at work at the Clopton yards, were ordered to paint cars with a paint blow-gun. The paint was forced from the gun against the car in the form of a fine spray by air pressure. The paint·used in the blow-gun contained 38.68 per cent white lead and 33.16 per cent zinc oxide. The defendant knew it was poisonous when inhaled through the nostrils or mouth, or absorbed through the skin, and had prior to that time purchased face masks and goggles for the protection of the operators of the blow-gun. Wheeler had never seen a blow-gun or a face mask, and did not know there was danger of being poisoned from the spray. He never saw any person use the face mask or goggles while painting. The defendant failed to warn him of the danger or instruct him to use the face mask or goggles, which it had supplied with the spray machines and hung up in the paint house. The regular painters who worked at Clopton yards prior to the strike wore the face masks when there was much painting to be done, but this was unknown to the plaintiff. Wheeler and Martin were required many times prior to June, 1923, to paint with the blow-gun in the open air when a high wind was blowing. As a result, Wheeler frequently inhaled the spray and got his face, hands and

clothes thickly covered with specks of paint.   In June, 1923, the master mechanic painter from Rocky Mount, N. C., instructed them never to use the paint blow-gun when the wind was blowing.

[2] When defendant's primary negligence has been established, plaintiff's right to recover does not depend upon defendant's ability to foresee or anticipate that the particular injury might result from such negligence. Under such circumstances, the defendant is liable for the natural or probable consequences of its own act.

In *N. & W. Ry. Co.* v. *Whitehurst*, 125 Va. 263, 99 S. E. 569, Judge Burks, speaking for the court, said: "When once it has been determined that the act is wrongful or negligent, the guilty party is liable for all the consequences which naturally flow therefrom, whether they were reasonably to have been anticipated or not.   *   *   The precise injury need not have been anticipated.   It is enough if the act is such that the party ought to have anticipated that it was liable to result in injury to others.   *City Gas Co.* v. *Webb*, 117 Va. 269, 84 S. E. 645; *Pulaski Gaslight Co.* v. *McClintock*, 97 Ark. 576, 134 S. W. 1189, 1199, 32 L. R. A. (N. S.) 825; Cooley on Torts (student's ed.), page 33; *Hill* v. *Winsor*, 118 Mass. 251; 25 Harvard Law Review, 245-6; 1 Shear. & Red. Neg. (5th ed.), section 28, and cases cited."

It was said by this court in *City Gas Co.* v. *Webb*, 117 Va. 272, 84 S. E. 646:   "If the act of omission is of itself negligent and likely to result in injury to others, then the person guilty thereof is liable for the natural consequences which occur, whether he might have foreseen it or not.   In other words, if the act or omission is one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others, then he is liable for an injury proximately re-

sulting therefrom, although he might not have foreseen the particular injury which did happen."

[3] The court, speaking through Keith, P., in *Pocahontas Collieries Co.* v. *Williams,* 105 Va. 708, 54 S. E. 868, says: "It is the duty of the master to inform an inexperienced servant of danger ordinarily incident to the service, and if he fails to do so and the servant has no opportunity to learn, then he will not be held to assume risks not obvious to one of his age, experience or judgment.

[4] "The question whether the servant should have been warned is always for the jury upon the evidence."

In *Wagner* v. *Jayne Chemical Co.,* 23 A. 772, 147 Pa. St. 475, 30 Am. St. Rep. 745, the court said: "An employer is bound to exercise reasonable precaution against injury to his employees while they are in his service and obeying his orders. Not only must he provide suitable implements and means with which to carry on the business which he sets them to do, but he must warn them of all the dangers to which they will be exposed in the course of their employment, except those which the employee may be deemed to have foreseen as necessarily incidental to the employment in which he engages, or which may be open and obvious to a person of his experience and understanding, and except, also, such as the employer cannot be deemed to have foreseen. And the employer will be presumed to be familiar with the dangers, latent as well as patent, ordinarily accompanying the business in which he is engaged. Authorities upon these points may be found in great abundance in the notes to sections 185-203 of Shearman & Redfield on Negligence."

In this case, the plaintiff inhaled poisonous fumes and was injured thereby. He was not warned of the danger by his employer, and there was testimony that he had

no previous knowledge of such danger. It was held that the defendant's negligence and the plaintiff's contributory negligence were questions for the jury and the judgment for the plaintiff was affirmed.

In *B. & O. Ry. Co.* v. *Branson,* 128 Md. 678, 98 Atl. 225, plaintiff was employed to paint freight cars and locomotives with a paint blow-gun, which covered the painter with a fine mist of paint. The plaintiff did not know of the poisonous character of the paint used. Defendant knew of the danger but failed to provide the plaintiff with a nose guard. Plaintiff's health was injured by the inhaling of paint, and he sued, alleging negligence in defendant's failure to provide safe and suitable appliances with which to perform the work. The court held that the question of defendant's negligence and the extent of plaintiff's injury were questions for the jury, and affirmed the judgment in favor of the plaintiff.

[5] The law as to proximate cause is laid down in 29 Cyc. page 492, as follows: "To constitute proximate cause, creating liability for negligence, the injury must have been the natural and probable consequence of the negligent act."

It is not necessary that the injury should be the inevitable result of the negligence, but only the probable result. In other words, "if the consequences follow in unbroken sequence from the wrong to the injury, without any intervening efficient cause, it is sufficient if, at the time of the negligence, the wrong-doer might, by the exercise of ordinary care, have foreseen that some injury might result from his negligence." *Pullman Palace Car Co.* v. *Loack,* 32 N. E. 290, 143 Ill. 260, 18 L. R. A. 220, and cases cited.

[6] It is obvious that there was ample evidence introduced in the instant case, tending to prove a

different state of facts, which, if believed by the jury, would have justified a different conclusion upon the question of the defendant's primary negligence. But this was a question for the jury, and their finding against the defendant is conclusive here.

[7] Was defendant's negligence the proximate cause of the plaintiff's blindness?

Plaintiff's witness, Dr. J. T. Watkins, a duly licensed and experienced optometrist, examined the plaintiff's eyes with an opthalmoscope in March, April and May, 1923, and found him suffering with optic neuritis, which was producing atrophy of the optic nerve and causing a loss of vision. He says optic neuritis is an inflammation of the optic nerve which may be produced by many causes, including lead poisoning, and that lead poisoning caused plaintiff to have optic neuritis, which atrophied the optic nerve, and in May, 1923, was causing complete blindness; and that in December, 1923, he had no vision in his right eye. He agrees with the other doctors who examined Wheeler, that in 1924 plaintiff was suffering from simple glaucoma. He also testified that lead poison may result from paint which is taken into the system through the mouth or nose, or by absorption through the skin.

In July, 1923, Wheeler went to defendant's hospital at Rocky Mount, N. C., to be treated for severe pains in his abdomen. Dr. Killinger, the physician in charge, examined his blood and diagnosed his trouble as lead poisoning and treated him for it.

It was not discovered until November 16, 1923, when he was examined by Dr. M. C. Edmunds, physician and eye specialist, who testified for the plaintiff, that Wheeler was suffering from simple glaucoma, or hardening of the eyeball. Dr. Edmunds says the ophthalmoscope showed he had optic atrophy, and

that both nerves were absolutely white; that the tono-meter showed that his eye was a little bit hard. He diagnosed the trouble as optic atrophy, probably secondary to chronic glaucoma. Doctor Edmunds says: "No one knows the cause of glaucoma;" that it is possible for Wheeler to have had optic neuritis which cannot now be detected on account of the presence of glaucoma, which is characterized by tension within the eyeball; that the fact that Wheeler was suffering with glaucoma does not mean that his trouble was not caused by lead poison; that the two troubles do not contradict each other; that lead poisoning results in blindness from its influence on the optic nerve by producing optic neuritis, and sometimes optic atrophy, which often follows lead poisoning.

In May, 1924, Dr. J. A. White, eye specialist, witness for the defendant, examined the eyes of the plaintiff and found he had simple glaucoma. Dr. White says lead poisoning produces blindness by inflammation of the nerves, while in glaucoma there is no inflammation of the nerve, blindness being produced by pressure from the inside of the eye on the end of the nerve. He does not think lead poison can produce glaucoma, and states that the profession have never yet agreed on the cause of glaucoma. In his opinion, glaucoma is caused by a "disturbance of the normal relation between the excretions in the eye and the excretion of them from the eye." He admits that it is possible for Wheeler to have had optic neuritis in March, 1923, which could not, on account of the changed condition of the eyes, be detected at the time of his examination in May, 1924. He also says it is possible for a person to have lead poison and glaucoma at the same time.

The defendant, knowing that the use of the paint blow-gun when a strong wind was blowing would

probably work injury to the operator, purchased face masks for their protection, but negligently failed to warn or instruct the plaintiff of such danger, which failure caused the plaintiff to contract lead poison. Loss of eyesight was the natural consequence of having his optic nerve atrophied by the action of the lead poison. The negligence of the defendant being the cause of the lead poisoning, which caused the injury, was the *causa causans*, or proximate cause, of the injury.

The fact that lead poison does not always injure one's eyesight is of no moment, since the evidence is that it did produce atrophy of the nerves and loss of vision in the instant case. As already appears, it is immaterial that the defendant could not anticipate that this particular injury might befall the plaintiff as a result of its negligence. The record discloses no independent, intervening cause between the negligence of the defendant and the injury to the plaintiff.

The instant case is distinguishable from *Allison* v. *City of Fredericksburg*, 112 Va. 243, 48 L. R. A. (N. S.) 93, and kindred cases. In that case, the plaintiff, an infant ten or twelve years of age, was injured by falling through a hole in one of the planks of a small bridge which the city maintained across one of its sidewalks. The actual injury at the time of the accident was slight, only resulting in a slight bruise on the leg near the knee. Shortly thereafter, however, a sarcoma, or malignant cancerous growth on the bone, occurred at or about the point of injury, which two doctors stated, in their opinion, was the result of the original injury to the knee. The plaintiff's leg was amputated above the knee, the operation being necessary to save her life. The negligence of the city was conceded, and it was conceded that the sarcoma resulted from the

original injury to the knee. The trial court and this court, in affirming the decision of the trial court, held (page 248 [71 S. E. 527]) that it was "clear that the injury sustained by her in stepping into the hole in the bridge was not the proximate cause of the loss of the plaintiff's leg. The sarcoma was not the natural and probable consequence of the plaintiff's foot going through the hole in the bridge, and could not have been foreseen in the light of the circumstances attending the alleged negligence of the city." It was further held in that case that the question of proximate cause, under the circumstances there presented, was one of law to be determined by the court, and not one of fact to be submitted to the jury. The plaintiff was permitted to recover for the actual injury to her knee occasioned by her fall, but was debarred from recovery for the sarcoma and the dire results which followed. The testimony of all the physicians, however, was to the effect that it was impossible for anyone to anticipate such a result from such an accident, one saying that no human power could have foreseen such a result from such an accident; that one hundred children could have fallen through and had similar injury, and a cancer not occur in one of the hundred.

[8] In the instant case, Dr. Edmunds testified that optic neuritis *frequently* follows lead poisoning.

Therefore, under the law, as stated, and the facts, the question of proximate cause was one for the jury, and they having found that the alleged wrongful act was the proximate cause of plaintiff's loss of sight, we cannot say such finding was without evidence to support it.

[9] The plaintiff's contributory negligence was also for the jury's determination, and their finding concludes that question in favor of the plaintiff.

[10] In *Judy* v. *Doyle*, 130 Va. 392, 405-6, 108 S. E. 10, the court says: "It is the province of the court to determine, in the first instance, whether or not the facts offered in evidence, tending to prove an injury to a plaintiff, are too remote from the defendant's act of negligence to constitute an element of the plaintiff's recovery. But where the court finds itself unable to make this ascertainment of remoteness, the question of what is the proximate cause of an injury is ordinarily a question for the jury."

In *Railway Company* v. *Kellogg*, 94 U. S. 474 (24 L. Ed. 256), the court said: "The true rule is that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or legal knowledge. It is to be determined as a fact in view of the circumstances of fact attending it."

The questions of primary negligence and proximate cause having been decided by the jury in favor of the plaintiff, we cannot upon the record say the verdict is contrary to the evidence or without evidence to support it.

The second assignment of error relates to the action of the court in giving and refusing instructions.

The defendant asked for twelve instructions, nine of which were given. The court also gave two other instructions, one on its own motion and the other at the request of the plaintiff.

[11] We have carefully examined all the instructions granted and refused. The instructions given were exceedingly favorable to the defendant and so fully covered the theory of the case that it was not reversible error for the court to refuse the three which were not given.

The third assignment of error is without merit, since we would not be justified in reversing the judgment

because of the court's refusal to admit certain testimony referred to in this assignment.

Had the verdict been for the defendant, we could not have disturbed it, and we find nothing in the record to warrant us in reversing the judgment in favor of the plaintiff.

## ON REHEARING, JANUARY 20, 1927.

Burks, J., delivered the opinion of the court.

A rehearing was granted in this case June 29, 1926. The case had been fully argued on the original hearing and carefully considered, but the case is on the border line, and it is conceded in the original opinion that the evidence was such that a verdict in favor of either party could not be set aside. Under these circumstances, some of the judges entertained some doubts as to our conclusion on the subject of proximate cause, and hence the rehearing was granted.

The rehearing has been had, and the case has been very fully argued again, both orally and on briefs, and, after a careful consideration, we adhere to the conclusions reached on the original hearing.

The petition for rehearing not only discussed the question of proximate cause, but argues at great length the question of the primary liability of the defendant. The petition, in effect, ignores the fact that the petitioner stands in this court as a demurrant to the evidence, and vigorously assails the facts which are set forth in the opinion as to *"tending to establish* the primary negligence of the defendant." Some of the arguments of the petition are immaterial. In other instances, testimony for the plaintiff is sought to be overcome by conflicting evidence offered by the de-

fendant. In others, it is said that there is no evidence in the record to sustain the statement in the opinion. This is a serious charge, not warranted by the record, but a detailed discussion of it would not be edifying or instructive. Upon a careful re-examination and reconsideration of the evidence, we find that the statement in the opinion on this subject is sustained by the record in every essential particular, and we adhere to it.

[12] The other ground upon which a reversal is sought in the petition for rehearing is that defendant's negligence was not the proximate cause of the plaintiff's blindness; that his blindness was not the result of lead poisoning but of glaucoma, which is a disease of the eye, which is not the result of toxic, or poisonous, influence.

Before discussing the evidence, it is necessary to advert briefly to the position occupied by the petitioner in this court. The petitioner's case is not within the exception referred to in *Norfolk & W. Ry. Co.* v. *Thayer*, 137 Va. 294, 119 S. E. 107, and he stands here practically as a demurrant to the evidence.

[13] A demurrant to the evidence is considered as admitting the truth of all his adversary's evidence unless inherently incredible, or judicially known to be untrue, and all just inferences that can properly be drawn therefrom by a jury, and as waiving all of his own evidence which conflicts with that of his adversary, or which has been impeached, and all inferences from his own evidence, although not in conflict with his adversary, which do not *necessarily* result therefrom; and if several inferences may be drawn from the evidence differing in degree of probability, those most favorable to the demurree must be adopted unless forced, strained or manifestly repugnant to reason. *Johnson* v. *Ches. & O. Ry. Co.*, 91 Va. 171, 21 S. E.

238; *Chès. & O. Ry. Co.* v. *Anderson*, 93 Va. 650, 25 S. E. 947; *Wolonter* v. *U. S. Casualty Co.*, 126 Va. 156, 101 S. E. 58.

[14] This rule has not been observed in the petition for rehearing. Nearly every witness introduced by the defendant was for the purpose of contradicting some testimony offered by the plaintiff, either as to facts or expert opinions, and free use has been made of such conflicting testimony in the petition to rehear. The real question which the defendant (petitioner for rehearing) has to consider was this: If after the plaintiff had introduced all of his evidence, and the defendant had been permitted to show consistent but omitted facts, the case had been submitted to the jury and they had found the present verdict, could the trial court have set it aside under section 6251 of the Code, or can this court, under section 6363, set aside a judgment of the trial court in accordance with the verdict, because plainly contrary to the evidence, or without evidence to support it?

[15] We had occasion to examine this subject carefully in *Forbes & Co.* v. *Southern Cotton Oil Co.*, 130 Va. 245, 108 S. E. 15, and it is there said: "It is not sufficient that the judge, if on the jury, would have rendered a different verdict. It is not sufficient that there is a great preponderance of evidence against it. If there is conflict of testimony on a material point, or if reasonably fair-minded men may differ as to the conclusion of facts to be drawn from the evidence, or if the conclusion is dependent upon the weight to be given to the testimony, in all such cases the verdict of the jury is final and conclusive and cannot be disturbed either by the trial court or by this court, or if improperly set aside by the trial court, it will be reinstated by this court. But with all the respect that is justly due

to the verdict of a jury, and which is freely accorded to it, if there has been a plain deviation from right and justice even a court of law will not make itself a party to such a wrong by entering up judgment on it."

[16] Under the rule governing a demurrer to the evidence, very little if any of the testimony for the defendant can be considered.

In the original opinion it is said: "Plaintiff's witness, Dr. J. W. Watkins, a duly licensed and experienced optometrist, examined the plaintiff's eyes with an opthalmoscope in March, April and May, 1923, and found him suffering with optic neuritis, which was producing atrophy of the optic nerve and causing a loss of vision. He says optic neuritis is an inflammation of the optic nerve, which may be produced by many causes, including lead poisoning, and that lead poisoning caused plaintiff to have optic neuritis which atrophied the optic nerve, and in May, 1923, was causing complete blindness; and that in December, 1923, he had no vision in his right eye. He agrees with the other doctors who examined Wheeler that in 1924 plaintiff was suffering from simple glaucoma. He also testified that lead poison may result from paint which is taken into the system through the mouth or nose, or by absorption through the skin.

    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"It was not discovered until November 16, 1923, when he was examined by Dr. M. C. Edmunds, physician and eye specialist, who testified for the plaintiff, that Wheeler was suffering from simple glaucoma, or hardening of the eyeball. Dr. Edmunds says the opthalmoscope showed he had optic atrophy, and that both nerves were absolutely white; that the tonometer showed that his eye was a little bit hard. He diagnosed the trouble as optic atrophy, probably secondary

to chronic glaucoma. Dr. Edmunds says: 'No one knows the cause of glaucoma;' that it is possible for Wheeler to have had optic neuritis which cannot now be detected on account of the presence of glaucoma, which is characterized by tension within the eyeball; that the fact that Wheeler was suffering with glaucoma does not mean that his trouble was not caused by lead poison; that the two troubles do not contradict each other; that lead poisoning results in blindness from its influence on the optic nerve by producing optic neuritis, and sometimes optic atrophy, which often follows lead poisoning."

This statement of the evidence is as favorable to the plaintiff in error as the record justifies. It appears further from the record that Dr. Edmunds, a witness for the plaintiff, testified in part as follows:

"Q. Does the fact that this man is suffering from glaucoma now mean in any way that his trouble was not caused by lead poisoning or other toxic infection?

"A. No; it does not mean it was not caused by that.

"Q. The two things don't contradict each other?

"A. No.

"Q. Suppose a patient comes to you and tells you that he has been suffering from lead poisoning, and you find the condition of his eyes to be the same as the condition of Mr. Wheeler's eyes at the time you examined him, would you connect the previous lead poisoning with the present condition of his eyes in any way?

"A. Well, I would think about that as a possible cause of it; I would not absolutely; I could not say it was absolutely, but I would consider it was a possible cause, knowing that we do not know the cause of this condition.

"Q. If, in addition, the patient told you, that for a year prior to the time of the examination, he had been

engaged in painting railroad cars without the use of gloves or a face mask, or any other protection, would that have inclined you towards the opinion that his present condition was connected with some toxic infection, due to poison taken from paint?

"A. Yes, sir.  It would lead me to believe that he would possibly have had lead poisoning.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. Now, Doctor, from what you found on your examination, was there anything in the physical examination of Mr. Wheeler which would cause you to conclude that this condition arose from lead poisoning rather than from something else?

"A. I found an optic atrophy, and optic atrophy often follows lead poisoning.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. Does glaucoma follow lead poisoning?

"A. I don't know the cause of glaucoma."

The paint gun issued the paint in a kind of fog.

Dr. J. W. Watkins, a witness for the plaintiff, much of whose testimony is set forth in the original opinion, testified that after getting the history of the case: "I determined in my own mind that he had toxic amblyopia," that is, dimness or loss of vision from poison. "In the history of the case I judge that he had a toxic condition that produced it."  He further testified, in answer to questions, as follows:

"Q. You said this was, in your opinion, due to a toxic condition?

"A. Yes, sir.

"Q. That is a sort of technical word.  What do you mean by toxic?

"A. Poisonous—some poison from some source.

"Q. After you knew about the history of the case and about the man being a painter, what was then your diagnosis, or opinion, of the cause of the optic neuritis?"

"A. I thought it was produced either by lead or some other substance in paint, and especially since he told me that he had been using a spray gun and that he could breathe this stuff in. It was all over his hands; nothing to see that he had been shielded in any way.

"Q. In the course of your studies have you had occasion to consult authorities about how this thing is taken into the system?

"A. Yes, sir.

"Q. What do they say?

"A. They say it can be absorbed or taken in when you breathe.

"Q. Taken through the nose?

"A. Yes, sir.

"Q. And mouth?

"A. Yes, sir; absorbed also through the skin."

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. Is glaucoma a more or less advanced condition than amblyopia?

"A. Well, a fellow could have glaucoma and amblyopia at the same time. Amblyopia is anything that would cause a dimness of vision, due to defective sensibility of the retina, and glaucoma, by pressure on the optic nerve, may cause amblyopia.

"Q. Then, in this case, when you first saw this man, you diagnosed him as having optic neuritis?

"A. I did.

"Q. At that time, he did not have, as I understand you, either amblyopia or glaucoma?

"A. Yes, sir; he had amblyopia.

"Q. At that time?

"A. Yes, sir.

"Q. Did he have glaucoma at that time?

"A. I couldn't say whether he had it or not. It didn't look like it.

"Q. Later on when you examined him, did you or not find that he then had the glaucoma?

"A. Yes, sir; later on he had glaucoma.

"Q. And that was apparent?

"A. Yes, sir.

"Q. And it had not been apparent before?

"A. No, sir; had not been apparent before, and was apparent two weeks ago when I examined him."

There is nothing in the testimony of any witness for the plaintiff that the cupped condition of the eyeball indicated that glaucoma had existed for a year or more previously. This comes from witnesses for the defendant introduced to contradict the expert opinion for the plaintiff and hence cannot be considered. Dr. G. W. Watkins, a witness for the defendant, testified in part as follows:

"Q. What is the cause of glaucoma?

"A. I never had but six cases of glaucoma and all of those came from influenza or pneumonia, following infection.

"Q. Isn't it a fact that all medical authorities agree that nobody knows what causes glaucoma?

"A. All agree they don't know what causes it; but all I ever had followed those two diseases."

From this the jury might have inferred that glaucoma might result from some precedent disease of recent origin.

[17, 18] Upon the testimony, and the inferences which a jury might fairly have drawn therefrom, the trial court refused to set aside the verdict, and we are unable to say that the verdict is plainly contrary to the evidence, or without evidence to support it. The question was one for the jury, and while the evidence presented a strong defense before the jury, it is not such a case as would warrant this court in setting aside

their verdict. The jury might have found that the plaintiff's blindness was proximately caused by the paint poison and that the glaucoma was a supervenient result.

[19, 20] The damaging effect of the testimony of Dr. J. W. Watkins was sought to be overcome by a vigorous assault on his competency to testify as an expert on diseases of the eye. No such objection was raised in the trial court, and it cannot be raised here now for the first time. But aside from this, Dr. Watkins testified that he was an optometrist, and that "optometry is the practice on the eye exclusively and to do everything practically except surgery and treatment," and that he "diagnosed cases," and when he thought it necessary he referred patients to a medical practitioner. Furthermore, his testimony on the subject of the treatment of diseases of the eye displays such knowledge of the subject as satisfies us that he was competent to testify as he did.

We adhere to the conclusion formerly reached by us.

*Affirmed.*